Moffatt v. Cauldwell.

---

## MOFFATT v. CAULDWELL.

*Libel — imputation of poverty — when libelous.*

A sensational newspaper article, which set forth that plaintiff was living in extreme poverty and destitution, which was false, and was maliciously published with the intention of injuring plaintiff's good name, etc., *held*, libelous.

While as an abstract proposition, poverty ought not to expose one to ridicule, one may be so circumstanced and the fact so put as to subject him to ridicule and nothing else ; and the question whether the matter is libelous depends upon the style, scope, spirit and motive of every such publication, and the inquiry then is, as to its material effect, not only upon the general public, but upon the neighbors and friends of the one aimed at.

APPEAL by plaintiff from an order at the special term sustaining a demurrer to the complaint.

The action was brought by Maria Moffatt against William Cauldwell and another for libel. The complaint alleged that the plaintiffs were owners and proprietors of a newspaper called "The Sunday Mercury," published in the city of New York; that contriving and maliciously designing to injure plaintiff in her good name, etc., did maliciously publish in said paper a false, scandalous and malicious libel. The libelous article was as follows:

"Strange but true — the Moffatt mansion in a new light — a family history and mystery — revelations of the domestic relations of a New York millionaire.

" Click, click, click, the sound of the sewing machine, the sharp jerk, the incessant whir of the instrument, is heard from early morning till late in the evening—heard, too, as proceeding from the garret of a boarding-house on University Place, the identical boarding-house, too, where formerly resided Mrs. General Eaton, whose romantic adventures are still fresh in the public recollection. In this garret, or attic, live, or at least breathe, two females, the one a very nice old person, evidently by birth and education, if not by present position, a lady; the other younger, but looking as old, if not more elderly, than her companion. On her face, and tall and thin figure, care has done its work, her large eyes are dilated with watching, and her countenance is sallow with the weary load of anxiety and hope deferred. She is attired in brown muslin of the cheapest sort, speaks but seldom, and seems utterly indifferent to society. The greater part of her time is passed out of doors, securing sewing work, which herself and her aged mother fulfill by indoor labor, assisted by the invaluable 'machine.' When these women descend to the dining table, they enter modestly, timidly take a corner seat, and seem to be afraid even so much as to request the ordinary attention due from servants. And yet these poor, hardworking people are ladies born and bred, women who once lived in an almost palace. Females whose near relatives are at this moment living in affluence upon the wealth, a portion of which, at least, is in honor and feeling to nature, if not in the technicalities of the law, their own. In other words, these women are the mother and sister of Dr. Moffatt, recently deceased, the millionaire physician, whose Life Pills and Phœnix Bitters had, in their day, a world-wide popularity, netting the inventor millions;

these women once occupied the celebrated Moffatt mansion as their home, and now they eke out a scanty pittance and wretched life, while a large family, who derive every dollar they consume from the earnings of their son and brother, roll in their carriage nightly to the opera. Such contrasts in the same family are seldom exhibited within the compass of the same city, and the strangest part of the affair is, that the existence of their poor relations is unknown to the wealthy branch of the family, and that, probably, their first information on this point will be afforded through the columns of the Sunday Mercury.

" The manner in which this 'transformation scene' in real life was brought about was substantially as follows: Dr. Moffatt, a fine-looking gentleman, of keen business habits, and a great believer in printer's ink and real estate, and devotedly attached to his mother and sister, chanced to meet at a fashionable boarding-house two sisters — both handsome, both modest, and both smart — orphans, who lived up to the full extent of a small annuity which was settled upon them. The doctor courted and married the elder of these girls, and, on his marriage, settled his mother and sister in the house near Union Square, afterward known as the Moffatt mansion, while he located himself, and his wife, and his wife's sister in an elegant establishment in Fifth Avenue; but one night he died suddenly of diphtheria, and a will was found — not such a will as he evidently intended to have left behind him, but still the only will that was found; and, taking advantage of some loophole in this document, some shrewed lawyers contrived to defeat what must have been the intention of the dead doctor, who was, as before remarked, a most exemplary son and brother, and absolutely managed to turn the deceased millionaire's own mother and sister out of doors upon the world, with not a roof to cover them. Accustomed all their lives to luxury, and unaccustomed to labor, the sudden blow fell upon these unfortunates with a crushing weight, and they have never recovered from the shock. They left New York, and for some years lived on the weekly sales of their personal effects saved from the general wreck; but then this resource failed them in time, and they returned to the metropolis. Meanwhile all trace of them had been lost. The widow of Dr. Moffatt had died suddenly at Long Branch. Her sister, too, had died, and all that remained of the rich Moffatts were the little children and their guardians, none of whom had ever seen those poorer Moffatts of whom we write, or

were even aware of their existence. The former now dwell in Thirty-fourth street, in a sumptuous establishment, the latter in a garret in University Place. And such is life."

Another article, published in another issue of said newspaper was also set forth in the complaint, referring to the same subject, as another cause of action.

To this complaint the defendant interposed a demurrer, on the ground that the facts set forth did not constitute a cause of action. The demurrer was sustained.

*Ira Shafer*, for appellant.

*Abel Crook* and *A. Oakey Hall*, for respondents, cited *Sanderson v. Cauldwell*, 45 N. Y. 401; *Weed v. Foster*, 11 Barb. 204; *More v. Bennett*, 48 N. Y. 476, 477; Townsend on Libel and Slander, § 142; *Clay v. Roberts*, 9 Jur. N. S. 580; *Pittock v. O'Niell*, 63 Penn. St. 253.

BARRETT, J. The demurrer admits the publication, its falsity and malice. Taken as a whole, we think the article was calculated to hold the plaintiff up to ridicule. The question cannot be summarily disposed of by simply saying that poverty is no crime. To arrive at a just solution the entire article must be read. Its scope and purpose must also be looked at. Journalistic intrusion into the privacy of domestic life, is sufficiently unwarrantable even when the truth is reported. But when a person is made the subject of a romance like that in question, admitted to be false in every particular and to have been published maliciously, it ceases to be a question of taste, and we think that an action will lie.

As an abstract generality, it is true that mere poverty ought not to expose any citizen to ridicule. But the proposition that ridicule is a *non sequitur* from such an imputation, is not universally true. One may be so circumstanced and the fact of his alleged misery may be so put as to excite ridicule and nothing else.

Take for instance the case of any well known citizen of wealth, assume his retirement from business, so as to eliminate all questions of mercantile credit. While he is still occupying a comfortable house and perhaps entertaining in a hospitable manner, a sensational account of his misfortunes appears in a public journal, stating as in the present case that he breathes "but scarcely lives" in "a

garret," that he manages by constantly sewing for a tailor, to eke out "a scanty pittance," and a "wretched life;" that for years he has lived by the sale of his personal effects saved from the general wreck, and other minute details. Can it be doubted that such a "sensation," taken in its length and breadth, and under such circumstances, would tend to expose the person in question to ridicule."

Again, neither is wealth a crime. Yet a poor man may be held up to ridicule by a false and malicious account of his sudden though perfectly honest acquisition of fortune, coupled with an elaborate and highly colored picture of his luxurious life and splendid ·entertainments.

It comes to this, that the question whether or no the matter is libelous so as to be actionable, depends upon the style, scope, spirit and motive of every such publication taken in its entirety.

The inquiry is then into the natural effect of the publication, not only upon the general public, but upon the neighbors and friends of the person aimed at. It follows that the demurrer should have been overruled.

The second count is undoubtedly bad, but it cannot be separately considered, as the demurrer was general and to the entire complaint.

The order appealed from should be reversed with costs and .he demurrer should be overruled with costs, with leave to the defendants to answer over within twenty days upon payment of the costs of this appeal, and of the costs of overruling the demurrer below to be adjusted.

*Order reversed.*